PICOT, Plaintiff in Error, v. PAGE *et al.*, Defendants in Error.*

1. A., in 1826, conveyed to B. all the land embraced in a certain Spanish concession "except that heretofore sold by the said A.," and warranted the same free from the claims of himself, and all persons claiming under him except those who then had deeds of record. Previous to the execution of this deed, A. had, in 1818, conveyed to his son C. a portion of said concession. This deed was duly recorded the day of its execution. At the date of the deed to B. in 1826 both A. and B. acted as if the deed to C. had not been in existence; and by many acts and declarations A. indicated that he intended by the deed of 1826 to convey to B. the land embraced in the deed of 1818. The deed of 1818 having been discovered to be in existence, A. procured in 1838 a reconveyance from his son C. of the parcel conveyed to him in 1818; this deed of reconveyance was recorded in 1845. In 1845, A. conveyed the land thus reconveyed to him to D. B.'s assignees entered into the possession of the tract in 1831, and continued in possession thereof, dealing with the property as their own, until ejected by D. *Held*, that the deed of 1838 did not enure to the benefit of B.'s assignees; that no estoppel could be worked as against A., B. and his assignees having been guilty of gross negligence in not examining the records to discover what conveyances had been made by A. and placed of record previous to the execution of the deed of 1826.

---

* RICHARDSON, Judge, having been of counsel, did not sit at the hearing of this cause. This case was decided· at the October term, 1857, of the supreme court.

2. The deed of Pierre Chouteau to his son Auguste P. Chouteau, dated September 22, 1818, operated to convey to said Auguste only that portion of Chouteau's Spanish concession as lay within the concession as surveyed by the United States; the tract thereby conveyed did not extend to Labeaume's ditch.

3. A warranty is implied in every partition.

4. A joint tenant or tenant in common can not purchase in an outstanding adverse title and hold the same for his own benefit.

*Error to St. Louis Court of Common Pleas.*

This was a petition in the nature of a bill in equity filed by Louis G. Picot as trustee under the will of Mrs. Ann Biddle, deceased. The defendants are Daniel D. Page, Louis V. Bogy, and Louis A. Benoist. The petition sets forth in substance that on the 28th day of December, 1822, Pierre Chouteau, being seized of a certain tract of land, entered into a contract with George F. Strother for the purchase and sale of the same to the said Strother; that the premises agreed to be conveyed to said Strother, for a consideration in said contract recited and stipulated for, are described therein as follows: " A tract —— —— of four arpens in front and forty arpens deep, lying upon the Vide —— road, opposite Duchouquet's farm, and embracing the Big spring, containing one hundred and sixty arpens; and a tract or parcel of land lying upon the Mississippi, extending upon the bank of the river from the tract of land sold by the said Pierre Chouteau to William C. Carr to a tract of land formerly sold by LaBome to William Christy, according to conveyance from Brazeau to LaBome, and running with each of these lines back as to embrace the Big Mound; the said tract of land to contain at least thirty arpens; with covenants to be therein contained, that the said two tracts of land at the time of conveyance is free from all encumbrances and demands whatsoever, and all other usual and reasonable covenants;" that " in June, 1826, by deed dated on the first day of June, 1826, the said Pierre Chouteau, in execution of said contract so far as the same was finally agreed to be executed between the parties, conveyed to the said George F. Strother the tract

of land" above described of thirty arpens (*a*); that in executing said deed it was the intention of the parties to carry into effect the said contract for the sale of said thirty arpens, now in the city of St. Louis, including said Big Mound;" that Strother, in 1830, sold to the Marine Railway Company the said tract of thirty arpens so acquired by him from Chouteau, excepting about seven arpens on the north sold by him .

(*a*) By this deed, which was recorded June 22, 1826, Pierre Chouteau conveyed to Strother the following tracts of land: "All that tract or parcel of land granted to the said Pierre Chouteau in October, 1799, by Carlos Dehault Delassus, Spanish commandant, beginning at Roy's line, running north to Labeaume's south line, and extending from the river to the common field lots west, it being intended to convey to the said George F. Strother, his heirs and assigns, all the land contained within the said concession, except *that* heretofore sold by the said Pierre Chouteau, according to his several contracts, to be limited by the metes and bounds limited and fixed by the intention of the parties at the time of the contracting. And one other tract of land containing four arpens, running on the river, and running back four arpens, making sixteen arpens, lying between the north line of the first described tract of land and the south boundary of the tract of land sold by Joseph Brazeau to Labeaume—said sixteen arpens being a tract or parcel of land confirmed to Joseph Brazeau and sold and conveyed by said Joseph to Pierre Chouteau, together with all the houses and appurtenances thereunto annexed. To have and to hold the said several tracts or parcels [pieces] of land with the tenements so intended and bargained to be sold, with every part and parcel thereof with the rights and appurtenances, unto the said George F. Strother, his heirs and assigns forever; and the said Pierre Chouteau and Bridget his wife do hereby warrant the same free from the claim of themselves and their heirs and all persons claiming under them, except those who now have deeds recorded in the clerk's office of St. Louis, according to the modification of said claims aforesaid dscribed. In witness whereof," &c.

The questions discussed in this case will be more readily understood by referring to "Diagram No. 1," accompanying the report of the case of Evans v. Greene, 21 Mo. 170. The lines aC, C D, De, ea, designate Chouteau's original Spanish concession and survey; the lines ab, bc, cd, de, and ea, designate said concession as surveyed by the United States in 1817. The Brazeau reservation of four by four arpens is represented on said diagram as located south of "Labeaume's ditch," which is designated by the line CD. The line EF designates the north line of the tract conveyed by Chouteau to William C. Carr. The land in controversy lies north of the north line of Carr and is partly within the Chouteau concession as surveyed by the United States in 1817, partly outside of said concession, as thus surveyed and within the Brazeau reservation and confirmation as surveyed by the United States, and partly in the gore west of the Brazeau reservation.

to Thomas and Coon (*b*) ; that a survey was made by Réné Paul in October 5, 1829, to ascertain the exact boundaries of the land sold by Chouteau to Strother and then about being sold by Strother ; that Pierre Chouteau and M. P. Leduc, his confidential agent, went on the ground and pointed out the particular premises intended to be included in the deed to Strother, which was surveyed accordingly ; that the owners of stock in the St. Louis Marine Railway Company were authorized by two several statutes repealing the charter of the company, to provide for the sale partition, gift or conveyance of their real estate ; that in pursuance of the authority conferred by the act passed February 15, 1841, certain described lots were by deed dated November 5, 1841, conveyed to the legal representatives of John Mullanphy, deceased, one of the stockholders in said company ; that Mrs. Ann Biddle, since deceased, was one of the legal representatives of the said Mullanphy, being entitled to an undivided interest of one-seventh in the lots so conveyed in partition to the legal representatives of said Mullanphy ; that Mrs. Biddle devised to the plaintiff, Louis G. Picot, an undivided one-third of her interest in said lots in trust for certain purposes ; that, after the making of the contract in 1822, Strother entered

---

(*b*) By this the following described tracts were conveyed to John O'Fallon and John Mullanphy in trust for the St. Louis Marine Railway Company : " All that tract or parcel of land granted to Pierre Chouteau in October, 1799, by Carlos Dehault Delassus, Spanish commandant, beginning at Roy's line, running north to Labeaume's south line, and extending from the river to the common field lots west, except that heretofere conveyed by the said Pierre Chouteau according to his several contracts, to be limited and and fixed by the intention of the parties at the period of contracting, and also with a reservation of a parcel of the said land contracted to be sold by the said George F. Strother to Martin Thomas, as surveyed as follows, &c. [Here follows a description of a tract of about six acres, located south of Labeaume's ditch.] Also another tract of land containing four arpens, running on the river, and four arpens back, making sixteen arpens, lying between the north line of the first above described tract of land and the southern boundary line of the tract of land sold by Joseph Brazeau to Louis Labeaume, and being part of the same tracts, pieces and parcels of land which the said George F. Strother purchased from Pierre Chouteau and Bridget his wife, by deed bearing date June 1st, 1826," &c.

into the possession of the said thirty arpens, therein described, and paid taxes, and continued to exercise exclusive acts of ownership until he conveyed the same as above mentioned; that after said conveyance the said company entered into the possession of said premises, made improvements thereon, paid all the taxes, and exercised the exclusive right of ownership until the same was divided among the stockholders as above stated; that in about the year 1836, on an examination of the title to said premises, or some portion thereof, it was discovered by the parties then interested that there was a deed on record from Pierre Chouteau to his son, Auguste P. Chouteau, which bore date and was recorded in the year 1818, and conveyed the same premises sold and conveyed to Strother (c); but the same, never having been set up or claimed as a conveyance, was probably never delivered, or, if it had been, was cancelled; that after this deed became known to the parties in interest they applied to the said Pierre Chouteau to have the matter corrected, so that the records would

(c) This deed, dated and recorded September 22, 1818, described the premises conveyed as follows: " A piece of land lying and situated at the place called 'la grange de terre," in the said county of St. Louis, and to the north and near to the said town of St. Louis; which piece of land contains twenty arpens in superficies, and is bounded on the south by the land which we have sold to William C. Carr, east by the river Mississippi, west by the lots of forty arpens, and north by the land which I, the aforesaid Pierre Chouteau, have acquired of Joseph Brazeau, and the ditch of the land heretofore belonging to Louis Labeaume; and in which twenty arpens and more, if it is to be found, is comprised all the mound called the ' grange de terre.' Which piece heretofore sold, being the most northern part, and the residue of the concession, which has been granted to me by Mr. Charles Dehault Delassus, formerly lieutenant governor of the former Upper Louisiana, now Missouri territory, the 16th October, 1799, and surveyed by Antoine Soulard, surveyor under the Spanish government, the 10th March, 1803—as will appear from the record of the said concession, plan and certificate of survey, registered in the office of the recorder of titles and lands for the said territory Missouri, book C, pages 378, 379 — that the said Auguste P. Chouteau, his heirs or assigns, may enjoy, do, and dispose of the aforesaid land as a thing to him being and belonging, with all the rights and privileges which thereto belong, or which may thereto belong, promising to warrant and preserve it from all claims, gifts, debts, dowries, mortgages, and of all other encumbrances generally whatsoever. In faith whereof, we have signed, sealed," &c.

exhibit a fair and regular title to the said thirty arpens of land; that said P. Chouteau being a man of large estate and of reputed probity, no examination had been made prior to said discovery to see if he had conveyed the same land intended to be conveyed to said Strother; but it was understood, as well at the time of the contract with Strother as the deed to him, that the residue except said thirty arpens had been conveyed to the several persons whose deeds were at the time well known to the parties to the deed to Strother, and the remainder was the part intended to be sold and conveyed to Strother, and was the part the parties had in view at the time of contracting; that said Pierre Chouteau being old and somewhat infirm, his son Pierre Chouteau, jr., was also applied to in relation to said deed to A. P. Chouteau, and it was concluded to procure a release or quit-claim from said A. P. Chouteau to his father, which it was understood was to vest the title to said thirty arpens in the grantees of said Strother and the persons claiming; that on application to said Auguste P. Chouteau, he, for the purpose of confirming said title to said Strother and the persons holding under him, and for no other or different purpose, and without any other than a nominal consideration, released and quitclaimed to his father the premises so appearing of record to have been conveyed to him in 1818, which deed of conveyance bears date March 15, 1838; that the object of said reconveyance was to perfect said title and remove what appeared to be a defect therein; that no claim was ever made by Auguste P. Chouteau under the deed of 1816, no possession claimed by him, and no acts of ownership exercised; that from 1818 to his death in 1839 said Auguste P. Chouteau was married and his family resided in St. Louis, though his business required him to be absent from St. Louis a large portion or the time; that he was frequently in St. Louis, and must have known and observed the possession and improvements of those claiming under Strother, and no claim was ever made by him in his lifetime to said land, nor was any claim set up or pretended by his father until some years after the death of

said Auguste; that said Pierre Chouteau, during his lifetime, resided in and near St. Louis and pointed out the land conveyed to Strother as belonging to him, Strother, and knew of the possession and improvement by the vendees of Strother and those claiming under them, and made no claim nor asserted any until, on or about November 21, 1845, he conveyed the same to Louis V. Bogy, &c. The petition proceeds to allege notice on the part of defendants of the equity of plaintiff. The plaintiff prayed the court by a decree to compel the defendants to release to him.

Evidence was adduced to show among other things that the location of the northern line of the tract conveyed by Pierre Chouteau to William C. Carr was in dispute; that about the time of the execution of the deed of P. Chouteau to Strother in 1826, at the request of Strother, a survey was made by Réné Paul of the various tracts previously conveyed by Chouteau to Lewis, Bates, Lisa and Carr, and of the residue of the Spanish concession of Chouteau; that Chouteau was present at this survey and pointed out and located the northern line of Carr; that at the request of Martin Thomas, one of the vendees of Strother, another survey was made and the northern line of Carr again located by said Chouteau; that said Pierre Chouteau pointed out the land north of said line as that which he had granted to Strother, and repeatedly declared that he had sold the same to Strother. Evidence was also given showing that the vendees of Strother (the St. Louis Marine Railway Company and its vendees) had entered into possession and made improvements upon said tract; that those claiming under the Strother title had made numerous sales, transfers, and exchanges of many parts of the Marine Railway tract. It appeared that though the family of Auguste P. Chouteau resided in St. Louis, he was rarely there, being an Indian trader among the Osages. There was also evidence tending to show that the contract of 1822 between Strother and Chouteau had been cancelled and abandoned.

The court found the facts as follows: "On the 28th of September, 1822, Pierre Chouteau was not seized of the land

lying north of Carr's north line, east of the east line of the St. Louis common fields, south of the south line or ditch of Labeaume, and west of the Mississippi river, nor of any part thereof, as charged in the petition; nor was he so seized at any time after September, 1818, and prior to March 15, 1838. The deed from said Pierre and wife to George F. Strother, dated June 1st, 1826, was not executed, nor intended to be, either in whole or in part performance of the alleged contract of the 28th of September, 1822, referred to in the petition; said contract was duly signed by the parties, and Strother made payments on account thereof as alleged in the petition, but he never paid the whole consideration called for by said contract, nor did said Pierre ever perform said contract on his part. Said contract was abandoned and rescinded by the parties thereto prior to 1826, and was not valid or subsisting on the 1st of June, 1826. Said deed of June 1, 1826, was not intended by said Pierre to convey to said Strother a fee simple absolute title to said tract of land above described nor to any part thereof; nor did said Strother understand it to be so intended; nor did said Pierre intend by said deed to convey any other or greater interest in said tract described in said deed, or in any part thereof, than said Pierre at the time had therein; nor did said Strother understand the deed otherwise. Both said Pierre and said Strother, on the first of June, 1826, knew of the existence and recording of the deed of September 22d, 1818, from said Pierre and wife to Auguste P. Chouteau; and said Pierre made no representations, prior to or at the time of the execution of said deed of June 1st, 1826, by which said Strother was misled, or on which Strother relied, nor any representations whatsoever to the effect that said Pierre was still the owner of, or had a right to convey, in fee simple absolute, said tract of land described in the deed from said Pierre to said Auguste. Nor is there satisfactory proof that said Pierre at any time thereafter made any representations to said Strother, or any of his assigns, with reference to the title of said tract last mentioned, by which either said Strother or any of his said assigns was

misled to his injury, or induced to purchase or improve any portion of said land. Said Strother and wife did convey to the trustees of the Marine Railway Company, and to Thomas and Coon, as alleged in the petition; and the grantees of Strother took possession of, and actually occupied and improved portions of said tract from 1830 to 1845, claiming title to the whole under Strother. During the whole of that time said Pierre resided in and near St. Louis, and frequently passed by said tract; and Auguste was a trader in the Indian country, but rarely visiting St. Louis, and then for brief periods only. The family of said Auguste resided all the time in St. Louis. The Marine Railway Company did, as alleged in the petition, make partition of the land (by it claimed as aforesaid) among its stockholders and their representatives, as averred in the petition. John Mullanphy, in his lifetime, was one of said stockholders. He died in 1833, leaving seven children, of whom Ann Biddle was one. The husband of Ann Biddle died in 1831. In 1846 Ann Biddle died, leaving a will as charged in the petition, by the terms of which one-third of her interest in the Marine Railway tract was devised to the plaintiff as stated in the petition. The lots described in the petition are included within the tract of land bounded south by Carr's north line, west by the east line of the St. Louis common fields, north by Labeaume's south ditch, and east by the Mississippi river, and are the lots conveyed by the Marine Railway Company, as alleged, to the representatives of said Mullanphy. The deed of March 15th, 1838, from said Auguste to said Pierre, was not made at the instance of Strother or of any of his assigns; nor for the purpose of perfecting their title to the land in question, nor for their benefit, nor for any of the purposes, nor at the instance of any of the persons, mentioned in the petition, nor for any other or different purpose than appears from the face of said deed. The various deeds and instruments of writing alleged in the petition to have been executed in 1845 and 1846, under which the defendants claim, were executed by the parties thereto. Whereupon the court declares that the plaintiff is

not entitled to the relief by him prayed for, nor to any other judgment or decree against the defendants, or any one of the defendants."

A motion for a review was filed in behalf of plaintiff, and overruled by the court.

*Picot* and *S. T. Glover*, for plaintiff in error.

I. The contract of 1822 was never abandoned. The parties thereto never relinquished so much of it as related to the land from Carr's north line to Labeaume's ditch. The deed of 1836 was drawn to convey this land, and would have done so but for the misrepresentation and mistake of the grantee which misled and deceived Strother. That agreement never has been performed. There is no evidence clearly showing its canceling. If cancelled, it was done in consideration of the deed of 1826. The money—$650—received on it was never returned. The deed of 1826 was supposed to convey the land to Carr's north line. It did not. The agreement to convey, then, is unperformed and outstanding. Where there is a contract to sell land, as long as it remains executory the vendor and vendee stand to each other in the relation of trustee and *cestui que trust*, and neither is allowed to set on foot any hostile proceeding against the other. If one procures an outstanding title, it enures to the benefit of the other. (10 B. Mon. 204 ; 2 S. & R. 515 ; 2 Tuch. Com. 454 : 1 A. K. Marsh. 424 ; 2 Dana, 387 ; 1 Hill on Trustees, 171 ; 1 Brock. 97 ; 1 Greenl. Ch. 254 ; Meigs, 181 ; 12 Pet. 294 ; 8 Humph. 439 ; 6 Humph. 309; 14 S. & R. 293 ; 3 Litt. 190 ; 5 Johns. Ch. 184; 5 Mon. 544.) In 1845 it was the duty of Pierre Chouteau still to convey. Chouteau could not withhold the interest acquired by him in 1838 without a violation of a plain principle of equity. He should be held to make his representations good. He should have corrected the mistake made by him and Strother.

II. The facts proved constitute an *estoppel in pais*. Chouteau did by his silence, by his representations, by his acts, and by every means of which he was capable, induce, prompt

and stimulate Strother, and those claiming under him, to buy, occupy, improve and sell the property in dispute. This he did in 1822; also down to 1845, while the property was his own after 1838. In 1841 he tells Anderson, "your title is good; there is no doubt of the goodness of your title." From 1838 to 1845 he suffers the improvements and sales to go on. Was not here a violation of the principles of equity? (5 John. Ch. 184; 18 Conn. 138; 17 Conn. 346: 17 Penn. 211; 8 Gill, 239; 3 Hill, 219; 5 Mon. 544; 18 Miss. 482; 4 Watts & S. 323; 4 Watts, 192; 2 Ala. 113.) *Estoppels in pais* operate on after-acquired titles. (5 Harr. 211.) The evidence is overwhelming to prove that it was the intent of the parties by the deed of 1826 to convey the land immediately north of Carr. The sale by Chouteau in 1822 shows that he supposed he owned the said tract. A. P. Chouteau never set up any claim to the land conveyed by the deed of 1818. He relinquished to P. Chouteau in 1838 for one dollar. (See further 1 Eq. Cas. Abr. 355, 357; Fonb. Eq. 164, 202; 2 Verm. 370; id. 150; 1 Ves. sr. 95; 2 Atk. 49, 83; Bunb. 53; 9 Mood. 37; 6 T. R. 544; 8 Shepl. 130; 1 John. Ch. 345; 6 id. 166; 16 Maine, 146; 1 Verm. 136; 5 Johns. Ch. 184; 3 Paige, 546; 12 Wend. 57, 130; 16 Wend. 285; 6 N. H. 107; 5 Yerg. 18; 1 Black. 363; 1 Br. Ch. 543; Cooper's cas. 308; 3 Cranch, 281; 2 Bibb, 449, 270; 1 Conn. & Law. 417; 15 Mo. 365; 21 Mo. 336; 2 Sto. Eq. 456; Bogy v. Shoab, 13 Mo. 381; 1 Cha. Cas. 274; 2 Cha. Cas. 212; 2 Verm. 211; 10 Co. 97; Co. Litt. 385 *b*, 45, 47; 7 Green, 96; 3 Metc. 121; 1 Fairf. 309; 12 Johns. 201; 13 Johns. 316; 1 Johns. Cas. 90; 7 Pet. 554; 30 Maine, 541; 1 Zabr. 544; 5 Pike, 698; 14 Ark. 462.)

*B. A. Hill* and *Shepley*, for defendants in error.

I. There can not be a decree for the specific performance of the contract of December 22d, 1822. It has never been performed; never set up for more than twenty years after its execution; never recognized by either party; and was found in 1845, *mutilated*, in the hands of Strother's administrator;

and the mutilation has not been accounted for. There is no averment of the performance of this contract or of any offer to perform it; there is no evidence of performance. If a vendor has no title when he agrees to convey, the vendee may recover back the purchase money, but he can not claim to have a specific performance of the contract. (10 Ves. 315; 6 Ves. 646; Rey. & Mo. 386; 3 Sim. 29: 1 Jac. & Walh. 421; 1 Mad. 1.) There is no evidence showing the contract in force in 1826; the court will not therefore decree a specific performance. (2 B. & B. 288; 1 id. 228; 6 Leigh, 174; 6 Johns. Ch. 117, 225; 3 Cow. 445; 2 H. & McH. 326; 4 id. 258; 1 Dess. 257; 2 Comst. 841; 7 S. & M. 768; 3 Sto. C. C. 278; 14 Pet. 77; 9 Ves. 234; 5 Ves. 845; 6 Paige, 288; 4 id. 305.) To enable a court to enforce a specific performance, it must be enabled to decree a specific performance of every part of it. (2 Drew. & War. 343.) No such decree can be made in this case. There are not proper proper parties.

II. The contract of 1822 can not be connected with the deed of 1826. If it could, the contract would be merged in the deed. (1 Raw. 377; 10 Watts, 427; 4 Harr. 39; 9 S. & R. 78; 8 W. & S. 11; 3 Watts, 316; 1 Watts & S. 83; 7 id. 201; 1 Penn. 208.) If the plaintiff claims that the deed of 1826 was intended to be an execution of the contract of 1822, but failed through mistake, accident or fraud to show such intent, it should have been so averred in the petition; and a reform should have been prayed for. There is no such case presented and no such prayer. The deed of 1826 must be construed by itself without any aid from the contract. The evidence of P. Chouteau's declarations does not go back of 1826. There are no declarations shown in regard to the contract of 1822. The deed of 1826 does not convey any land before then conveyed by recorded deeds. It contains no warranty of title; does not convey a fee simple absolute. The deed of 1838 did not enure to the benefit of Stother's assigns. (Bogy v. Shoab, 13 Mo. 379; 14 Ill. 306; 19 Verm. 272; 14 Johns. 193; 5 Ala. 413; 13 Pick. 116; 12 id. 47;

3 Metc. 121; 4 Wend. 622; 20 Pick. 458; 24 id. 324; 29 Maine, 185; 6 Cush. 34; 5 Cush. 56; 14 N. H. 326; 5 Grat. 162; 3 McL. 78; 27 Maine, 361; 2 Kent, 99.) The deed of 1826 operated to pass to Chouteau the gore west of Carr. All the deeds of Pierre Chouteau—to Bates, Lewis, Carr and Lisa, and to A. P. Chouteau—are made part of the deed of 1826 by recital.

III. Parol evidence is inadmissible to show that there was any trust raised by the two deeds of 1826 and 1838. (2 S. & R. 515; 4 W. & S. 161; 7 Barr, 380; 2 Edw. Ch. 37; 6 John. Ch. 111; 2 id. 415; 1 id. 342, 240; 9 G. & Jo. 80; 1 Ham. 321; 6 Paige, 448; 5 id. 114; 4 Dessau. 486; 3 id. 149; 6 Conn. 285; 2 Gren. Ch. 357; 1 McCord, 18; 2 Ala. 152; 5 Rand. 211; 10 Paige, 170; 6 id. 323; Cow. & Hill's Notes, part 2, vol. 3, p. 1428.)

IV. The sixteen arpens known as the Brazeau reservation were conveyed to Strother by the deed of 1826 as lying north of Labeaume's ditch. It passed by the same description to the trustees of the Marine Railway Company by the deed of 1830. The Marine Railway conveyed the same to John Magwire in 1852. Magwire conveyed to Bogy. This Brazeau reservation and confirmation was located south of the ditch by the United States, so as to cover part of the premises sued for. The plaintiff has no title to this reservation, for the Marine Railway never acquired it as land lying south of Labeaume's ditch. It is therefore immaterial whether the survey and patent for the reservation is conclusive or not.

Scott, Judge, delivered the opinion of the court.

This cause has been argued as though it was the case of Bogy v. Shoab, 13 Mo. 365, with the difference that the former case was presented in the shape of an action at law, whilst the present suit is one in the nature of a proceeding in equity. We do not regard the matter in this light. We conceive that the title to a small portion only of the land involved in this controversy is subject to the considerations,

legal or equitable, that are applicable to the determination of the suit between Bogy and Shoab & Collins. We consider that the title to only so much of the land in dispute as lies within the concession to Pierre Chouteau, as surveyed and patented to him by the United States, is to be determined by the considerations which have been presented by the pleadings and arguments in this cause. The land, the title to which was involved in the case of Bogy v. Shoab, was all within the concession and patent of Pierre Chouteau; and only the title of so much in this suit as is similarly situated can be regarded as subject to the considerations which operate in determining the dispute between Bogy and Shoab, whether it is presented in a legal or equitable form. The title to the land not within the concession of P. Chouteau, as patented, must, in our opinion, be adjusted on principles entirely foreign to those which affect the case of Bogy v. Shoab, in whatever forum it may be discussed. It will thus be seen that this suit branches itself into two parts influenced by entirely different considerations.

We will first examine that branch of the case which has been presented in the pleadings and arguments of counsel, premising that what will be said is intended as being only applicable to the title of so much of the land in dispute as is situated within the concession as patented and surveyed to P. Chouteau. The plaintiff has based his claim to a judgment on several grounds. It is maintained that this is a petition for the specific performance of the contract between George F. Strother and Pierre Chouteau, made on the 28th day of December, 1822; that although Chouteau was not the owner of the land at that date, yet, as he acquired a right to it subsequently, a court of equity will compel him, or those claiming under him with notice of the plaintiff's equity, to convey that title in satisfaction of the agreement. Without going into the question whether the agreement is a subsisting instrument or not, we are of the opinion that the petition on its face negatives the idea that any one of its objects was a specific performance of the contract of 1822. It is averred

that by a deed dated 1st June, 1826, Pierre Chouteau, in execution of said contract (meaning the contract of 1822) so far as the same was finally agreed to be executed, conveyed to Strother the tract of land, the subject of this suit ; that in executing said deed of 1826 it was the intention of the parties to carry into effect the said contract for the sale of the land, the subject of this suit. The petition further charges that the defendants refuse to release their title to the plaintiff, and as a justification thereof sometimes pretend that the deed of said Chouteau to said Strother is void, and, if not, does not and was not intended to convey the land in question ; whereas the plaintiff charges the contrary thereof to be the truth, and that the said deed is not void, but does, and was intended to, convey the land described in the original contract between the said Chouteau and Strother. It is further stated, " and they (meaning the defendants) sometimes pretend that the deed to the said Strother was not executed in pursuance to said contract made in 1822 ; whereas the plaintiff charges the contrary to be the truth, and that the said deed was intended between the parties to convey the land included in said contract and of which Pierre Chouteau represented himself to be the owner." These extracts from the petition are amply sufficient to show that the enforcement of the specific performance of the contract of 1822 never entered into the head of its framer. So far from it, they conclusively prove that for the purposes of this action the agreement of 1822 has been subsequently executed by the deed of 1826.

It is next maintained that the object of the bill is to obtain a reformation of the deed of 1826 ; but as the petition alleges that the deed of 1826 was intended to convey and did convey to Strother the land in controversy, it could hardly have been framed with such a view.

The ground mostly relied on to entitle the plaintiff to the relief he seeks rests for support in the conduct of Pierre Chouteau, which it is alleged by a kind of equitable estoppel prevents him, and those claiming under him being affected with notice, from asserting a title hostile to that claimed by

the assigns of Strother; that although Chouteau may not have had the title to the land at the date of the deed in 1826, yet as he subsequently acquired title thereto in 1838, it enured to the benefit of the assigns of Strother; that those taking from Chouteau his legal title acquired in 1838, being volunteers or affected with notice of the equity of Strother's vendees, stand in no better situation than P. Chouteau himself, and are compellable to convey their title to the plaintiff as he would have been; that having purchased on the faith of Chouteau's conduct and representations, he and those claiming under him are estopped from denying that the title subsequently acquired enured to the benefit of Strother's assignees.

Pierre Chouteau, by a deed dated September 22, 1818, conveyed to A. P. Chouteau the most northern part and the residue of the concession which was granted to him by Charles Dehault Delassus, formerly lieutenant governor, on the 16th day of October, 1799. This deed was duly recorded on the day of its date. By the deed of June, 1826, to which reference has been made, Pierre Chouteau conveyed to G. F. Strother the same concession mentioned in the deed to A. P. Chouteau except that heretofore sold by the said Pierre Chouteau, and warranted the same free from the claim of himself and wife and their heirs and all persons claiming under them, except those who now have deeds recorded in the clerk's office of St. Louis. We do not deem it necessary to go into a detail of the various facts and circumstances in evidence relied on to show that P. Chouteau was estopped by principles of equity from asserting a title hostile to that of Strother, or that would induce a court of chancery to compel him to convey the title subsequently acquired. It may be that the circumstances relied on would in some cases induce a court of equity to grant the relief sought by the plaintiff; but it seems to us that there is an ingredient in this case which disarms a court of chancery of all authority to interfere in behalf of Strother or those claiming under him. That ingredient is gross negligence. When men are guilty of

gross neglect; when by shutting their eyes they fail to see that which will secure them from all deception, it is not the province of courts to relieve them from the consequences of such conduct. The very instrument under which Strother and his assigns claim, referred them to the records in order that they might know what land they obtained from P. Chouteau. Without that reference it could not be known what Strother purchased. If that reference had been made, there would have been no occasion for this suit; for the records would have disclosed the fact that the land claimed by Strother had long previously been sold to another. Here is the language of the deed: "All that tract or parcel of land granted to the said Pierre Chouteau in October, 1799, by Carlos Dehault Delassus, Spanish commandant, beginning at Roy's line, running north to Labeaume's south line, and extending from the river to the common fields west; it being intended hereby to convey to the said G. F. Strother, his heirs and assigns, all the land contained within the said concession except that heretofore sold by the said Pierre Chouteau according to his said several contracts, to be limited by the metes and bounds limited and fixed by the intention of the said parties at the period of contracting; and the said Pierre Chouteau and Bridget his wife do hereby warrant the same free from the claim of themselves and their heirs, and all persons claiming under them, except those who now have deeds recorded in the clerk's office according to the modification of said claims as aforesaid described." It would thus seem that the deeds of record in relation to this tract were incorporated into and made as it were a part of the deed to Strother. Metes and bounds were to be ascertained in order to know the quantity of land conveyed. The deeds of record would show what those metes and bounds were. There is no charge of fraud against Pierre Chouteau. It is not pretended that any practices were put in use to induce Strother to forbear an examination of the records. The deed to A. P. Chouteau, having been made a long time before, might have been forgotten by Pierre Chouteau. Not

knowing what he had formerly sold and unwilling to trust to his memory, he referred Strother to the record ; and in effect said : " That only is sold to you which the records do not show has been heretofore sold ; that alone I warrant to you." One who would take a deed like this and afterwards complain of his ignorance of a prior recorded conveyance would furnish an instance of willful blindness—one in which the eyes were willfully closed in order to shut out the light—a forbearance to search the records for fear that they would impart notice.

The principle that courts of equity will not relieve in cases where the party applying for assistance has been guilty of gross negligence is well established and sustained by a great weight of authority. Sugden says, in all cases where a purchaser can not make out a title but by a deed which leads him to another fact, whether by description of the parties, recital, or otherwise, he will be deemed cognizant thereof ; for it was *crassa negligentia* that he sought not after it ; and, for the same reason, if a purchaser has notice of a deed, he is bound by all its contents. (2 Sugden, V. & P. 445.) In the case of Neesom v. Clarkson, 2 Hare, 173, the court says that " every purchaser is presumed to have investigated and known his vendor's title ; and if nothing more were proved in this case than the mere fact that the purchaser took a conveyance in 1817, and upon inspecting the title which was assumed to be conveyed to him it appeared that it was one which in truth gave no title to the vendor, the court would consider the *onus* thrown on the purchaser to show why he had not inquired into that title with a view to his protection. It appears to me indispensably necessary that such should be the law of this court, for otherwise a purchaser might take a title, shutting his eyes to a defect in it, and then, on the ground of absence of actual knowledge, require this court to pronounce a judgment in his favor against the right of the party justly entitled to the estate, when nothing but willful blindness or culpable negligence could have prevented him from knowing the real state of the title."

The principle involved in this case before us is analogous to the doctrine above stated. We have not considered the effect of notice resulting from a deed duly registered. We do not deem it necessary. This is a much stronger case, as we regard the records incorporated as it were in the deed ; and it was culpable negligence to rely on any other source for information. Nor do we consider how far the defence, resting on the fact that the defendants were purchasers for a valuable consideration without notice, could avail in this case. The fact that defendants claimed under a deed which conveyed to them the title of Strother, and afterwards purchased that derived from A. P. Chouteau for the sum of $18,000, is evidence of the *bona fides* of their conduct, except against those who held such a relation to them in regard to a common title as prevented them from purchasing for their own benefit an adverse title.

In the examination of the other branch of this case, which relates to the land which lies beyond the limits of the concession granted to Pierre Chouteau by lieutenant governor Delassus, as surveyed and patented by the United States, it will be necessary to ascertain whether the deed from Pierre to A. P. Chouteau conveyed any other land than that which was embraced within the limits of the said concession as defined by the United States survey. The following are the words descriptive of the premises conveyed by the deed of Pierre to A. P. Chouteau : " A piece of land lying and situated at the place called ' La Grange de Terre,' in the said county of St. Louis, and to the north and near to the said town of St. Louis ; which piece of land contains twenty arpens in superficies, and is bounded on the south by the land which we have sold to William C. Carr, east by the river Mississippi, west by the lots of forty arpens, and north by the land which I, the aforesaid Pierre Chouteau, have acquired of Joseph Brazeau and the ditch of the land heretofore belonging to Louis Labeaume, and in which twenty arpens and more, if it is to be found, is comprised all the mound called the ' Grange de Terre ;' which piece hereto-

fore sold being the most northern part and the residue of the concession which has been granted to me by Mr. Charles Dehault Delassus, formerly lieutenant governor of the Upper Louisiana, now Missouri territory, the 16th October, 1799, and surveyed by Antoine Soulard, surveyor under the Spanish government, the 10th March, 1803 ; as will appear from the record of said concession, plan and certificate of survey, registered in the office of recorder of titles and lands for the said territory Missouri, book C, pages 378, 379."

That we may the better understand this matter, it should be stated that the survey of A. Soulard, to which the above reference is made, was executed under the Spanish government ; and the concession as surveyed by him extended to the ditch of the land formerly owned by Louis Labeaume. Pierre Chouteau also was the owner of a small tract of land of sixteen arpens, which he purchased from Joseph Brazeau ; and it has been a matter of dispute whether this tract was situate north or south of the ditch. If one conveys to another a tract of land by the description of a concession as it is understood among us, it is the received opinion that the description will only pass the title to whatever land the officers of the United States government may designate by a survey made upon the confirmation of the concession or grant, without regard to the survey of the grant as made by the officers of the Spanish government. If the entire concession is conveyed, the quantity surveyed in satisfaction of the concession will pass to the grantee, whether it be more or less than was in the contemplation of the parties at the time of the sale. This principle is recognized in the case of Bogy v. Shoab. For reasons, however, which will hereafter be stated, we do not consider this a matter of much importance in this case. We do not wish, however, to be understood as maintaining that if a party has other lands adjoining his concession he may not by apt words convey those lands along with it. In the construction of the informal parts of deeds we deny the authority of any rules which determine the force of words from their situation or position in a sentence.

When a thing is intended to be conveyed, we must regard the entire description in order to ascertain what it is. Words can neither be written or spoken at once, yet the mind comprehends them all, and, when expressed, the sense of the whole is to be gathered without regard to the order in which they stand. The precise truth of all the enumerated circumstances is not required in order to ascertain the identity of the thing granted; but in such cases the rule is, *ex multidudine signorum colligitur identitas vera*. It will not be maintained that the deed is void for the uncertainty of the description of the premises. The true interpretation of every instrument is that which will make it speak the intention of the party at the time it is made; and when any doubt arises upon the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *de hors* the instrument itself.

If we consider the first part of the description of the land conveyed, it is evident that it was not intended to sell the Brazeau tract; inasmuch as the land sold is bounded on the north by land Chouteau had acquired of Brazeau. Chouteau then owning no other land south of the Brazeau tract than the concession, that was all he could convey. It may be said that the other northern boundary in the description— "the ditch of the land heretofore belonging to Louis Labeaume"—shows that he intended to sell all that he owned up to the ditch, and that he was mistaken as to the true location of the Brazeau tract. But there is evidence showing that Chouteau may well have believed that his concession extended to the Labeaume ditch. We have seen that, by a survey of it executed under the Spanish government, it was made to extend to that ditch. Besides, as he expressly bounds the grant by the Brazeau tract on the north, it is clear that he did not intend to embrace that tract, and we can not override this plain indication of intent by supposing he was laboring under a mistake, especially as there is evidence

that he might have supposed that he could alien all the land mentioned in the deed without including the Brazeau tract.

We do not overlook the fact that at the date of this deed the United States survey of the concession had been executed. When we refer to the subsequent clause of the description, as that was added to make certain the purpose of the deed, this matter is manifest. It is a rule of interpretation that *verba posteriora addita propter certitudinem ad priora quæ indigent certitudine sunt referenda.* After there had been a description of the land conveyed, and that description not deemed sufficiently definite and certain, another is added to make plain the subject matter of the grant. Reference must be made to a subsequent clause in order to explain a previous clause of which the meaning is doubtful. Applying to this last clause of the deed the rule that *veritas nominis tollit errorem demonstrationis,* and the land granted is clearly described. This shows the thing intended to be conveyed, and when that is ascertained any error of demonstration will not affect it. It shows that the concession was only intended to be sold ; and, although the concession may not be as extensive as the grantor supposed, we can not make it include land to which he had no title, or which it is clear he did not intend to convey. Although the United States survey of the concession had been made at the date of the deed, yet the language of the deed shows that the grantor had in his mind the concession as it existed under the Spanish government. As the concession as surveyed under that government extended to the ditch, nothing was more natural than that he should give it that boundary. If the intent of the maker of a deed is to govern in its construction, then it is plain upon the face of the instrument that the Brazeau tract did not pass by the deed to A. P. Chouteau. The maxims of interpretation have been referred to, not that they were necessary to ascertain the intent of the deed, but to show that the intent declared is in harmony with all those rules. There is nothing in the circumstances of this case which should in the least induce a court, even if it were allowable to do so, to

give a more liberal construction to this deed than is required by the rules and principles of law.

The deed then to A. P. Chouteau not including the Brazeau tract, it remains to be determined what effect that fact has on the rights of the parties to this controversy. This is a branch of the subject which is not presented to the court by the record and pleadings; nor have any suggestions in reference to it been made by the counsel who argued the cause. Under the circumstances, therefore, it is with diffidence that we enter upon this part of the case, and will rather state some general principles, which may have some application in the future progress of this cause should the facts turn out as we suppose. It appears that the land, the subject of this controversy, was once owned by the St. Louis Marine Railway Company. Under the authority of the acts of the general assembly entitled, respectively, "An act to repeal the charter of the St. Louis Marine Railway Company," approved January 25th, 1837, and February 15, 1841, the company, in March, 1841, took steps towards carrying these acts into effect. Being authorized to make partition among themselves of the land belonging to the company, among other resolutions in relation to the subject they passed the following: "That in making this division the stockholders agree that the title of the property is equally good; and if the title of any part thereof proves to be inferior to that of the residue, the owner of that part shall be indemnified by the other stockholders so as to preserve the fairness and justness of this partition; and all the stockholders shall bear their rateable proportions, according to the number of their respective shares, in all costs and expenses of any litigation in defending or perfecting the title of any portion of said tract." It appears that deeds were afterwards made to those holding an interest in the lands of the company.

Independently of the effect of this resolution, whatever it may be, it is a rule of law that a warranty is implied in every partition. It is also a rule of equity that one standing in the relation of a joint tenant, tenant in common, joint devisee, &c.,

can not purchase an outstanding adverse title for his own benefit, but that such title will enure to the advantage of all the joint owners, they bearing the expense and cost in proportion to their respective shares. In the case of Vanhorne v. Fonda, 5 Johns. Ch. 406, Chancellor Kent says: "I will not say that one tenant in common may not in any case purchase an outstanding title for his exclusive benefit; but it is not consistent with good faith, nor with the duty which the connection of the parties as claimants of a common subject created, that one of them should be able, without the consent of the other, to buy in an outstanding title and appropriate the whole subject to himself, and thus undermine and oust his companion. It would be repugnant to a sense of refined and accurate justice. It would be immoral, because it would be against the reciprocal obligation to do nothing to the prejudice of each other's equal claim which the relationship of the parties as joint devisees created. Community of interest produces a community of duty; and there is no real difference on the ground of policy and justice whether one cotenant brings up an outstanding encumbrance or an adverse title to disseize and expel his cotenant. It can not be tolerated when applied to a common subject on which the parties had equal concern and which created a mutual obligation to deal candidly and benevolently with each other, and to cause no harm to their joint interest." In the case of Beauchamp v. Venable, 3 Dana, 326, the court says: "The reciprocal rights and duties of the parties might be further illustrated; but we think it has been sufficiently shown that even if there had been no express warranty in the deed of partition, the parties, each of them, being under an implied warranty, would have been precluded from evicting the other by an adversary title; and the purchase by either party of such adverse title would, as well after partition as before, enure to the benefit of the other." Without a reference to the case itself, the syllabus in Rector v. Waugh, 17 Mo. ——, would seem inconsistent with what is said here with respect to an implied warranty in a partition between joint tenants and tenants in common. At

common law, joint tenants and tenants in common were not compellable to make partition. If a partition was made among them it would be voluntary, and the law would no more imply a warranty than in a conveyance between any other vendor and vendee. But where the partition was compelled, as between parceners, there the law implied a warranty.

It has been said that the money paid by one cotenant would be a common burden on the joint owners. But if a sum was paid for an adverse title which was supposed to affect the whole of the common property, and it should turn out that the title to only part of the property was defective, the cost and expense of making good the title to that portion of the common estate which was defective would only be allowed. It would be hard to make a cotenant pay a part of the expense which was unjustly incurred in endeavoring to undermine him; the case would be different if the money was paid with common consent.

It will be seen that this case has been determined without affecting that of Bogy v. Shoab. The land involved in that suit similarly situated to that in the present controversy, is adjudged to remain in Bogy and those claiming under him. The land not embraced in the deed to A. P. Chouteau and outside the concession to Pierre Chouteau, as patented, is adjudged to be in Strother's assignees.

Under the circumstances, this case will be reversed and remanded, the appellant paying the costs in this court. In doing this, it is not intended to express the opinion that the plaintiff's remedy is a petition in the nature of a bill in equity if he sees proper to go on with the suit. The cause is remanded that he may take his own course on the terms that may be imposed on him.*

---

* A motion for a rehearing was made on behalf of respondents and overruled.